[No. 3487.]

H. H. DOUGHTY *v.* THE STATE.

1. EVIDENCE — DISQUALIFICATION OF WITNESSES BY INDICTMENT. — By article 731 of the Code of Criminal Procedure, it is enacted that "Persons charged as principals, accomplices or accessories, whether in the same indictment or different indictments, cannot be introduced as witnesses for one another," etc. *Quœre:* — Does this provision deprive a defendant of the benefit of the

deposition of a witness who was competent when the deposition was taken, but who, after it was taken and before the defendant's trial, was indicted for the same offense as that charged against the defendant?

2. Same — Case Stated.— Having been indicted in October, 1883, for the murder of one M. in the preceding July, the appellant took the depositions of B. and H., who were non-residents of this State and competent witnesses when their depositions were taken, although, prior thereto, they had been arrested on a charge of the same homicide, but had been discharged on *habeas corpus*. Before the appellant's trial, the attorneys for the State and the defense filed their written agreement that the said depositions might be put in evidence by either party without objection for formal defects, but subject to such objections as could be made to the evidence if the witnesses were testifying in person before the court. Three days after the filing of this agreement, the said H. and B. were indicted for the same murder as that charged against the appellant, but no effort has ever been made to arrest them under these indictments. About a year subsequent to the indictment of said B. and H., the defendant was put on trial, and he offered in evidence their said depositions; but the State objected to them because of said indictments then pending against the deponents, and the trial court sustained the objection and excluded the depositions. *Held*, in view of the facts disclosed by the record, that the indictments against the defendant's witnesses were not obtained in good faith, but for the purpose of depriving him of their testimony; wherefore the disqualification provided by article 731 of the Code of Criminal Procedure does not obtain, and the trial court erred in sustaining the objection of the State, and in excluding the depositions. Note the strictures of this court upon such attempts to deprive a defendant of his right to adduce evidence in his behalf.

Appeal from the District Court of Presidio.    Tried below before the Hon. T. A. Falvey.

The indictment in this case was presented by the grand jury of El Paso county, in the district court of the said county, on the 15th day of October, 1883. It charged the appellant with the murder of Thomas Mode, in El Paso county, on the 11th day of July, 1883. The venue was changed to Presidio county on the application of the appellant. The trial, which was had at the April term, 1885, of the district court of Presidio county, resulted in the appellant's conviction of murder in the second degree, his punishment being assessed by the jury at confinement in the penitentiary for the period of five years.

S. W. Boring, city marshal of the town of El Paso, was the first witness examined for the State. He testified that he knew the deceased Thomas Mode in his life-time. He was on the police force when he was killed. On the morning of July 11, 1883, it was reported to witness by Wheat, the jailer, that a disturbance, in which Mode was shot, had occurred at a sporting house known as "Number 19." Witness went to the said house and found Mode dead.

Gypsey Davenport, Alice Abbott and Dora Scott, sporting women, were at the house when the witness arrived. Other parties, including Mode's wife, or at least a Mexican woman who was reputed to be his wife, arrived later. Witness made some inquiries of the inmates as to the facts and circumstances attending the killing, as to the persons who were present, and as to the character of their appearance and dress. The names of Doughty and Biddle were given by the inmates, and the other persons present were described by their dress. These parties proved to be Horn, Burt and Mears. Search for the various parties was immediately instituted. Defendant could not be found, but Horn, Burt and Biddle were arrested on the same morning, in the town of El Paso. Much excitement prevailed, and threats of lynching were freely made. Defendant was a stranger in El Paso. He was arrested late in July or early in August following. Before defendant's arrest, Horn, Burt and Biddle had a hearing on *habeas corpus* before the district judge, and were discharged. A reward of $500 was offered by the citizens of El Paso for the arrest of defendant, which was promptly paid. Alice Abbott was a prostitute, and was an inmate of house Number 19, which was a public house of prostitution.

W. H. Wheat, city jailer of the town of El Paso, testified that one night in July, 1883, policeman Tom Mode came to the jail and told him that some parties were creating a disturbance at a house known as the "Mansard Roof," and asked the witness to go with him to see about it. Witness and Mode went to the "Mansard Roof," and were told by the inmates that the parties who created the disturbance had but recently left, and that they were all unknown except Biddle, the "Lone Star Man." Witness and Mode were shown a door the panel of which was broken in, according to the inmates, by the parties for whom they were searching. From the "Mansard Roof" witness and Mode went to the National Theatre, where they were told that the party had just left, going in direction of house "Number 19." Arriving at house "Number 19," witness rapped at the door. Alice Abbott, an inmate, or a woman whose voice witness took to be hers, answered: "Come!" Witness went in and, recognizing Biddle, asked him to step out to the porch, which Biddle did. At the north end of the porch, some twelve or fifteen feet from the main door, the deceased asked Biddle if he had any weapon. Biddle threw up his hands, saying "No, search me." Mode passed his hands around Biddle's body, with what result witness could not see, as the night was quite dark. Mode then stepped to the door of the main room and asked if a man named Doughty

was present. The report of a pistol was the only reply that the witness heard.

Mode did not ask, " Where is that man Doughty?" when he stepped to the door. In stating that he did, on the *habeas corpus* trial of Horn, Burt and Biddle, the witness, if he made such statement (as appears of record), was mistaken. The firing commenced immediately after Mode stepped to the door. The lights in the house were extinguished as soon as the firing began. Witness did not know how the difficulty commenced, nor did he know more than stated as to what occurred in the house. When Mode came out of the house he exclaimed " O!" and fell a few feet from the porch. Witness then went for Marshal Boring and Doctor Justice, who repaired to the house. Neither the witness nor Mode had warrants for the defendant. The witness stated on the trial before the coroner that some fifteen shots were fired during the melee, but reduced the number to eight before the examining court. Witness did not count the shots, but thought that as many as eight were fired. Five or six shots were fired in the house, and two or more from the rear of the house towards the spot where Mode fell. Alice Abbott was known as a prostitute, and was, at the time of the killing, an inmate of house " Number 19," a well known house of prostitution. There was no disturbance at house " Number 19 " before witness and Mode went there, that the witness knew of. Defendant was a stranger in El Paso at the time of the homicide.

The testimony of Alice Abbott is here reproduced in full. It is as follows: "I was living at house Number 19 in El Paso, El Paso county, Texas, on the 11th day of July, 1883. About 1 o'clock on that morning Doctor Mears, Doughty, Biddle, Horn and Burt came to house 'Number 19,' and took seats in the parlor. Besides the persons named, the witness and Dora Scott were in the parlor. Doctor Mears was sitting at the piano on the north side of the room, playing. Defendant was sitting near the head of the lounge on the east side of the room. Biddle was sitting at the end of the same lounge, near the door, and the witness was sitting between them. Burt and Horn were sitting on a sofa on the west side of the room, opposite witness, Doughty and Biddle; and Dora Scott was sitting near them. The lounge at which witness, defendant and Biddle were sitting was north of the door which opens into the parlor from the east, and the sofa occupied by Burt and Horn was south of the west door of the parlor, which opened into a back room. The room was a small one, and had a porch on the east side of the parlor.

" After defendant and the parties named had been at the house

for some little time, some one rapped at the door which opens from the front door to the parlor. Dora Scott called out 'Come!' and Wheat entered, whereupon Dora called out 'They are the officers.' Wheat asked Biddle out, and Biddle followed him out. Doughty remarked that they would not arrest him, drew his pistol, and swung it over the head of the lounge, on the outside. Dora then said: 'We can't have any of that here,' and asked him to put up his pistol. He then pulled the pistol over the head of the lounge, to a position between his body and the head of the lounge, and I don't know whether he took his hand off of his pistol or not, but he put the pistol out of sight. The parties were all well behaved, and were guilty of no misconduct, and when Doughty said he would not be arrested and pulled his pistol out, he did not seem angry, and witness did not think he meant anything. His manner was not threatening.

"Soon after Wheat and Biddle left the room, policeman Mode entered and said: 'Which of you men is Doughty?' Doughty, who was still sitting on the lounge by me, said 'I am the man.' Mode then motioned his hand toward him, and said 'You are the man I want,' and Doughty, who was in a reclining position, began to straighten himself up on the lounge. I then ran into the back room on the west, and when I looked back Mode and Doughty had their pistols presented at each other, Doughty still on the lounge. Afterwards the shooting commenced. There was a slight pause after the first shot, and then several shots were fired in quick succession, but I was not looking in that direction when the shooting commenced, and I cannot say who was the first to present a pistol, or the first to fire. Policeman Mode was a tall, slim man, over six feet high, and wore a broad brimmed hat with the brim turned up in front. Doughty was a small and a young man, and a stranger to me. Mode was also a stranger to me. Mode did not announce that he was an officer. Horn and Burt had nothing to do with the difficulty at Number 19 that I saw. Mr. Mode died from the effect of his wounds on the morning of July 11, 1883."

John Mears testified, for the State, that he first met the defendant at the National Theatre, in El Paso, on the night of July 10, 1883, and was introduced to him by Biddle. He also met and was introduced to Horn and Burt at the same time and place. Witness and the parties named went to the "Mansard Roof" and "Number 19," houses of prostitution. While at the latter house, having been there but a short time, some one rapped at the front door, and some one of the inmates said "Come in," and city jailer Wheat entered and took Biddle out. In a few minutes policeman Mode came into

the room, and asked which of the men present was Doughty. Defendant replied: "My name is Doughty." Mode, in a peremptory manner, then said: "You are the man I want." It was the impression of the witness that, when Mode made this last remark, he threw his hand back on his pistol, and presently witness heard a pistol click, but could not say whose pistol it was. Witness then retreated into a back room, into which the witnesses Alice Abbott and Dora Scott had preceded him. The firing began after witness left the room, and witness did not know who did the shooting. Neither Horn nor Burt had anything to do with the shooting that the witness saw. Doughty was a stranger in El Paso, and, so far as the witness knew, did not know either Mode or Wheat. At the time that Wheat and Mode arrived, everything was orderly and quiet at house "Number 19." When Mode and Wheat entered, the witness was sitting playing at the piano, with his back towards the company. Doughty was sitting on the lounge near the head, when Mode entered, and was still sitting there when the witness left the room. Horn and Burt were sitting on the opposite side of the room from the door at which Mode entered, and were facing that door.

Doctor A. L. Justice was the next witness for the State. He testified that he was called to examine the body of the deceased on the morning of July 11, 1883, at a house known as "Number 19," in El Paso, Texas. Witness made but a casual examination of the body. It was his recollection that the ball entered the body between the seventh and eighth ribs on the right side, and made its exit between the fifth and sixth ribs on the left side, indicating that the person who fired the fatal shot was, at the time he fired it, in a sitting or reclining position. This wound undoubtedly caused the death of Mode. A bullet, with blood on it, was picked up on the floor and handed to the witness. Witness made no examination of the depth of the bullet holes in the wall.

On cross-examination, the witness said that he found a bullet a few inches from the front door. He noticed two fractures in the wall, one to the right and one to the left of the door, which were evidently caused by the contact of bullets or other missiles. The ball which made the fracture on the right of the door was picked up from the floor. The bloody bullet spoken of by witness was, he believed, a forty-five calibre pistol ball. The ball which passed through Mode's body encountered no bony obstruction, and it was therefore possible for it to penetrate the wall after leaving the body. The height of the bullet hole on the wall corresponded very nearly with the exit of the ball from Mode's body. Mode was a man six

feet and, perhaps, some inches in height. The ball, weighing one hundred and ninety grains, was the one found behind the door. This ball the witness picked up himself. The ball weighing two hundred and thirty-nine and a half grains was picked up by some one else. In reply to a question by counsel the witness answered as follows: " The front door of the parlor of house Number 19 being open, and a shot fired from the head of the lounge to the right of the door, the bullet making a hole in the wall to the left of the door, would have passed through the door."

The important testimony for the defense, contained in the depositions of the witnesses George W. Horn and W. O. Burt, was excluded by the trial court, and this ruling forms the basis of the decision of this court, reversing the judgment below. In order to present the case in full, the interrogatories and answers of the said witnesses are set forth below. The deposition of George W. Horn was first offered in evidence.

Interrogatory first. " Were you present on the night when Tom Mode was killed? When and where did it occur?"

Answer. "I was present on the night when Tom Mode was killed. The killing occurred on the morning of July 11, 1883, at about the hour of 2 o'clock, at a house called ' Number 19,' in the city of El Paso, El Paso county, Texas."

Interrogatory second. "If to the first question you answer yea, please state who else was present when Mode was killed?"

Answer. " When Tom Mode was killed on the said morning, there were present, besides myself, Mr. W. O. Burt, Doctor Mears and Mr. H. H. Doughty. At the time Mode was killed, there were no other persons in the room where the shooting was done. Mr. Biddle had been in the room, but was called out by Mr. Wheat a few moments before the shooting. Two women had also been in the room where the shooting was done, but they walked out into another room about the time Mr. Biddle was called outside of the house by Mr. Wheat."

Interrogatory third. " Please state how the killing occurred, giving all the circumstances in detail?"

Answer. " On the said morning, about the hour stated, Mr. Burt, Mr. Biddle, Doctor Mears, myself, Doughty, a woman called Alice, and a woman called Dora, were sitting in the parlor of the said house called Number 19. We were talking to each other. I was sitting on a sofa in the southwest corner of the parlor. Mr. Burt was sitting beside me. Mr. Biddle, the woman called Alice and Mr. Doughty were sitting on a sofa on the east side of the said parlor,

just to the right of the door through which one passes from the porch into the said parlor. Doctor Mears was sitting on a piano-stool in front of a piano, in the north end of said parlor. The woman called Dora was sitting on a chair on the west side of the said parlor. She sat near a door leading from the parlor into another room, and near the end of the sofa on which I sat, and I sat on the end of the sofa nearest her. Mr. Burt sat at the other end of the same sofa. Mr. Biddle sat on that end of the sofa, on the east side of the parlor, that was nearest the door leading from the porch into the parlor. The woman called Alice sat next to him, and Mr. Doughty sat on the other end of the said sofa at a distance of about six feet from the said door leading from the said porch into the said parlor. The said door was to Doughty's left, and Mr. Biddle and the woman Alice sat on the sofa between him and the door.

"While we were all sitting in the order stated, Mr. Wheat called Mr. Biddle out of doors. The door leading from the porch into the parlor was closed before Mr. Wheat made his appearance. Some one knocked, and one of the women called out 'Come in;' the door was opened and Mr. Wheat made his appearance, and stood in the door. We all kept our seats. Mr. Wheat then told Mr. Biddle to come outside, as he wished to speak to him. Mr. Biddle got up and went outside. When Mr. Biddle got up and went outside, the two women called Alice and Dora got up and went out of the parlor into a room on the west side of the said parlor. Just after the said women went out of the said parlor, Mr. Tom Mode stepped into the parlor from the porch. The door leading from the porch into the parlor was partly open before Mr. Mode stepped in. After he came in, the door swung back and remained partly open while he stood in the floor. At this time all who were in the room, excepting Mr. Mode, were sitting as before stated. Mr. Doughty was sitting in a half reclining position, with his right hand and arm resting on the end of the sofa — his left hand resting on his leg or down on the sofa. Mr. Mode spoke up, and said: 'Which one of you men is named Doughty?' Mr. Doughty kept his seat and replied: 'My name is Doughty.' Mr. Mode then, in a very abrupt manner, said to Mr. Doughty: 'You are the man I want.' Mr. Doughty then straightened up on the sofa, but did not rise from his seat. Mr. Mode then commenced to draw a pistol from his right side. As he drew his pistol out from his right side, I heard it click as if he were cocking it. Just at the moment I heard the pistol click, I saw Mr. Doughty drop his right hand very suddenly be-

tween himself and the head of the sofa. Just at the moment I saw Mr. Doughty drop his right hand as stated, I jumped from the place where I was sitting and rushed through the parlor into the room into which the two women had previously retreated. The shooting commenced just as I passed through the door between the parlor and the said back room. I do not know who fired the first shot. When the shots were fired in the parlor, my back was towards the parties, Mode and Doughty, and I was going from them. I think four shots were fired in the parlor. I cannot, however, be positive as to the number of shots fired in the parlor. They were fired rapidly and in immediate succession. When I got outside of the house, I stopped near the door leading outside from the room into which the two women went, as before stated. When I got outside, the firing had ceased. I heard one shot outside of the house, but I could not tell in what direction it was. It was fired from the other side of the house from me. After the firing ceased, I stepped back into the room through which I had passed from the parlor. I could see that the parlor was dark, and did not go into it. The woman called Alice rushed up to me just at that time and exclaimed: 'Oh my G—d! what shall I do? Somebody is killed!' I replied: 'No I reckon not,' and she said: 'You had better skip out; you may be arrested.' I told her that I had done nothing to be arrested for. Then I walked out the back way and went to my room at the Central Hotel."

Interrogatory fourth. "Please state and describe your position in the room or place where the killing occurred, and your opportunities, if any, for seeing what occurred."

Answer. "As I have before stated, I was moving rapidly out of the parlor with my back toward Tom Mode and Doughty, into the room into which the women had retreated when the shooting began. After I jumped from my seat and started out, I could not see either Mode or Doughty. I was just about to pass through the room on the opposite side of the room from Mode and Doughty, when the firing commenced. I was not in a position to see what was done, after jumping from my seat, by either Mode or Doughty."

Interrogatory fifth. "Please state if you know who commenced the difficulty; who began it; who drew the first pistol, and who fired the first shot. Please state particularly all you saw or know in this connection; how many shots in all were fired and by whom."

Answer. "Mr. Mode commenced the difficulty by the manner in which he spoke, and by drawing his pistol. He began the difficulty in this way: Mr. Mode drew the first pistol, and the only pistol I

saw drawn. I did not see Doughty draw his pistol, for just as he dropped his hand, I jumped from my seat and did not look toward him again. I do not know who fired the first shot. I have stated all I know in this connection. According to the best of my knowledge four shots were fired in the parlor, and one outside of the house. I do not know who fired a shot. I did not see either Mode or Doughty fire. I simply heard the shots under the circumstances related, and saw nobody shoot."

Interrogatory sixth. "When did you arrive in El Paso? When did Doughty arrive in El Paso?"

Answer. "I arrived in El Paso about 5 o'clock in the afternoon of July 10, 1883. I found Doughty in El Paso on the evening of my arrival. He started from Chihuahua, Mexico, on the morning of the day before, July 9, 1883. As I found him in El Paso when I arrived on the 10th, and as he left Chihuahua on the 9th with the avowed intention of going to El Paso, I presume that he arrived in El Paso during the 9th day of July, 1883."

The deposition of W. O. Burt was next offered in evidence by the defense, but excluded.

Interrogatory first. "What is your name, age, residence and occupation; how long have you lived at your present place of residence? State whether or not you were in the city and county of El Paso, State of Texas, in the month of July, 1883; upon what date you arrived and who came with you."

Answer. "My name is William O. Burt. My age is twenty-six years. My residence is Bonita, Lincoln county, New Mexico, and my occupation is that of a mining agent. I have lived five months at my present place of residence. I was in El Paso, Texas, in the month of July, 1883. I arrived in El Paso on the 9th day of that month, and was accompanied by Howard H. Doughty."

Interrogatory second. "Are you or not acquainted with Howard H. Doughty, defendant in this cause, who stands indicted for the murder of Thomas Mode, deceased, on the 11th day of July, 1883? If you answer yes, state how long, and state at that time what business said defendant was engaged in."

Answer. "I am acquainted with Howard H. Doughty, the defendant in this cause. I have been acquainted with the defendant for eleven years. He was engaged in the stock business when we came to El Paso."

Interrogatory third. "State whether or not you met said defendant at El Paso in the month of July, 1883, and whether or not you were present at the time and place it is alleged that the said

Thomas Mode, deceased, was shot. If you say you were present, then state all that you saw or heard at that time and prior to the shooting."

Answer. "I was with Howard H. Doughty in the month of July, 1883, in El Paso, and was present at the time and place it is alleged in the indictment that Thomas Mode was shot. I went with the said Doughty, George Horn, Nicholas Biddle and Doctor Mears, on the night of July 10, 1883, to the National Theatre. While there Doughty had some trouble with one of the actors, and also with an unknown man, while we occupied the first box on the left hand side of the theatre. We were drinking beer and champagne. I do not know what time we left, but it must have been about 12 o'clock. Doughty was somewhat under the influence of liquor. When we left we went to a house of ill-fame known as the 'Mansard Roof.' While there Doughty tried to enter an occupied room, failing to do which, he broke the panel of the door with his fist, and then returned to the parlor where myself, the remainder of the party and several inmates of the house were sitting. Immediately after this I went up stairs. While in the hall way, one whom I supposed to be the landlady asked me what she should do about the broken door. I told her to make Doughty pay for it, and proceeded on up stairs, where I stayed about five minutes. When I returned down stairs we all left the house, having been there, I would judge, about thirty minutes. We went on down town, passing the National Theatre, whence we went to the house known as Number 19. We had been seated in the parlor of that house about five minutes when the door opened and officer Wheat, whom I knew by sight, stepped in and called Mr. Biddle, who was sitting on a sofa near the door. I was sitting opposite the door, and saw another man standing behind Wheat, but that man did not come in. Shortly after the door closed it was opened again, and the man whom I had seen with Wheat, and whom I afterwards learned was Tom Mode, entered the room. He looked around and asked: 'Which one of you men is Doughty?' Doughty answered 'I am the man.' Mode turned to him immediately and said: 'Well, you are the man I want,' at the same time commencing to draw his pistol, using both hands to do so. He carried his pistol on his right side, but while facing Doughty his left side was turned towards me. I did not see his pistol but heard it click very loud as he cocked it. I sprang towards the back door of the room, and as I reached it the shooting commenced. There appeared to be a single shot, or two fired simultaneously. The lights were extinguished at the first shot. I went through the rear room and out at the back door, and did not return to the house."

Interrogatory fourth. "Who fired the first shot? How many shots were fired, if you know? How did they appear to be fired? Where did the shooting occur — in what house — and state all who were present at the shooting, and if you say you were present, when and under what circumstances did you leave? State what was the manner of Tom Mode's coming to the house? State particularly what he said and did. State whether or not he drew a pistol and presented it at the defendant, and whether or not defendant drew a pistol and pointed it at the deceased, Tom Mode; and which one drew first, or made the first motion to draw his pistol, and any other fact that occurred then and there, in regard to the said shooting, that you know of your own knowledge, the same as if you were specially interrogated."

Answer. "I do not know who fired the first shot. I should judge that there were from four to seven shots fired, but the witness could not count them. There were, as it seemed to witness, one or two fired at first, and then two or three in rapid succession. After I got outside, in the rear of the house, I heard one more shot, which appeared to come from the front or porch of the house. The shooting occurred in the house known as Number 19. There were in the room at the time, besides myself, just prior to the shooting, H. H. Doughty, Nicholas Biddle, George Horn, Doctor Mears and two inmates of the house, whose names I afterwards learned were Alice Abbott and Dora Scott. I started to leave the room as soon as I heard Mode cock his pistol. The two women had already left the room. Mode's manner on entering the room was very abrupt, and he gave no intimation that he was an officer. The only words he spoke were: 'Which one of you men is Doughty?' and, as Doughty answered that he was the man, Mode turned to him, saying: 'Well, you are the man I want,' at the same time reaching for his pistol. He stood just inside of the door, and at the foot of the sofa upon which Doughty was half reclining. I did not see either the pistol of the deceased Tom Mode, nor did I see the defendant draw a pistol and point it at Mode. The defendant had no weapon in his hand at the time that I heard the click of Mode's pistol and started to leave the room. Mode made the first motion to draw a pistol. I sat where I could see Doughty, who sat with his right hand resting on the head of the sofa, and he made no motion to draw a pistol up to the time I started to leave the room. I think that I was the last person, except Doughty and Mode, to leave the room."

Interrogatory fifth. "How many shots were fired at the time of the shooting of the said Mode, deceased? Describe the house in

El Paso in which it occurred? Who were present when Mode came into the house? Describe how they were seated, or where they were, and in what manner and time in respect to each other they left the room when the shooting occurred,— that is who left first, second, etc., if you know."

Answer. " I do not know the exact number of shots fired at the time of the shooting of the said Mode, deceased. The house in which the shooting occurred was on the next street south of El Paso street, and nearly opposite the National Theatre. It is a one-story adobe house, with a porch in front, and contains four or five rooms. The back of the house is towards El Paso street. The room in which the shooting occurred has a door opening to the porch in front. When Mode entered the house, I was sitting opposite this door, on a sofa, with George Horn on the same sofa, to the right of the front door on entering. Biddle was sitting with Doughty on the same sofa and near the door. Alice Abbott sat between Doughty and Biddle. Doctor Mears was sitting on the stool at the piano. Dora Scott was in a rocking chair between a center table and the back door of the room, and between Mears and Horn. Biddle left the room when called by Wheat. The others were in the positions last above mentioned when Mode entered. Dora Scott left the room as soon as Mode entered, and Alice Abbott left as soon as Mode reached for his pistol. I did not see Mears leave the room, but he left before Horn and I did. Horn and I both went out at the back door together, just as the shooting began. No one was left in the room when the shooting began, except Doughty and Mode."

The opinion sets out, in substance, the agreement of counsel respecting the use of these depositions as evidence on the trial.

The motion for new trial complained that the court erred:

1. In overruling defendant's exceptions to the indictment.

2. In excluding the depositions of Horn and Burt.

3. In submitting a charge that was misleading and incorrect.

4. In failing properly to define murder in the second degree and implied malice.

5. In failing to charge the law of manslaughter.

6. In charging that the evidence was largely circumstantial.

7. In pronouncing judgment on a verdict that was unsupported by either law or evidence.

*A. Blacker* and *Lanham & Stephens*, for the appellant. The court erred in excluding the depositions of the witnesses Horn and

Burt, because at the time said depositions were taken, and at the time the district attorney agreed that they should be read in evidence, said witnesses were competent to testify in behalf of appellant, and no subsequent indictment of said witnesses could render their evidence so taken inadmissible.

The evidence of these witnesses was certainly material and of vital importance to defendant. There was no indictment or other accusation against said witnesses when their depositions were taken, but they had been released on *habeas corpus* and set free, and not until three days after the district attorney had agreed in writing that their depositions might be read in evidence were they indicted. (*Lobdell's Adm'r* v. *Fowler*, 33 Texas, 346; *Ables et al.* v. *Miller*, 12 Texas, 109; *Myers* v. *The State*, 3 Texas Ct. App., 8; Whart. Crim. Ev. (8th ed.), sec. 445; Greenl. Ev., secs. 168, 379 and 407.)

The court erred in excluding the depositions of said witnesses, because the inference is irresistible from the record that said witnesses were indicted for the purpose of depriving appellant of the benefit of their testimony, and for no other purpose; and to allow the district attorney to use said indictments for that purpose, after agreeing that said depositions might be read in evidence, was in violation of defendant's rights and oppressive.

The proof shows that the killing was a sudden transaction and without premeditation or concert, and the eye-witnesses for the State say that said Horn and Burt had nothing to do with the killing. They had a hearing on *habeas corpus*, and were discharged before said depositions were taken. The grand jury which indicted appellant failed to indict said witnesses, and they were not indicted till the venue was changed. The venue was changed on account of prejudice against appellant in El Paso. The citizens of El Paso had offered and paid a reward of $500 for the capture of appellant. There was talk of lynching him soon after the killing. A year passes by after said indictments are found and no steps taken to prosecute them, and the excuse rendered by the district attorney, when he objected to the evidence, was that they were non-residents and therefore had not been arrested. (*Haynes* v. *The State*, 40 Texas, 54.)

The definition given in the charge of murder in the second degree was, under the facts of this case, misleading, and especially so in the absence of a charge on the law of manslaughter. The court in effect charged the jury that, if the killing was done in a "transport of passion" produced by an attempted unlawful arrest, under circumstances which would not justify the killing on the ground of

self-defense, it would be murder in the second degree.    The charge was excepted to.

The facts of the case imperatively demanded a charge on the law of manslaughter, and the failure to give it prejudiced the rights of appellant.    The court told the jury in the charge that the attempted arrest was unlawful.    It is not even shown by the statement of facts that said Mode was a policeman of any *incorporated* town or city. (*Johnson* v. *The State*, 5 Texas Ct. App., 46; *Alford* v. *The State*, 8 Texas Ct. App., 566; *Ross* v. *The State*, 10 Texas Ct. App., 464; *Dyson* v. *The State*, 14 Texas Ct. App., 461; 16 Texas Ct. App., 391.)

The court submitted the law of self-defense in case deceased attempted an unlawful arrest with deadly weapons, but not in case he attempted it by superior physical force, owing to their great disparity in size.

The court erred in telling the jury that the case was "largely circumstantial," thereby misleading the jury and charging on the weight of the evidence and commenting thereon.    The case was not circumstantial, for the main State witness, Alice Abbott, was an eye-witness.

*J. H. Burts,* Assistant Attorney-General, for the State.

Willson, Judge.    On the night of the 10th day of July, 1883, appellant shot and killed Tom Mode at a house of prostitution in the city of El Paso.    There were present at the time and place of the homicide, besides appellant and deceased, the following named persons, viz.: Mears, Burt, Horn, Biddle, Wheat, Dora Scott and Alice Abbott.    Biddle and Wheat were not in the room where the shooting occurred, but were on the porch of the house.    Mears, Dora Scott and Alice Abbott, the two latter being prostitutes and inmates of the house, were inside the room when the difficulty commenced, but immediately fled from the room and did not witness the whole of the transaction.    These three witnesses testified on the trial of the case.    Burt and Horn were the only other eye-witnesses to the homicide.    On the next day after the homicide, Mears, Burt, Horn and Biddle were charged with the murder of the deceased and were arrested.    They applied for and obtained a writ of *habeas corpus*, and upon a hearing had thereon before the district judge were discharged.    Appellant was not arrested at that time.

At the next term of the district court for El Paso county, in October, 1883, appellant alone was indicted for the murder of deceased.    Burt and Horn, at the time of the homicide, were non-

residents of this State, and have since then continued to reside out of the State. After appellant was indicted and arrested he obtained the depositions of Burt and Horn in his behalf, under and in accordance with the provisions of the statute in such cases provided, and these depositions were returned to and filed in the cause then pending in the district court of El Paso county. Thereafter appellant *obtained a change of venue from El Paso county to Presidio county*, upon the ground that there existed against him so great a prejudice in El Paso county that he could not obtain a fair and impartial trial in said county. Thereupon his counsel and the district attorney made and filed among the papers in the cause a written agreement to the effect that the depositions of Burt and Horn, then on file in the cause, might be read in evidence on the trial of said cause in Presidio county, waiving all objections to the manner and form of taking the same, and subject to such legal objections and exceptions as might be made to the interrogatories and answers were said witnesses personally before the court, giving evidence. This agreement was made and filed on the 22d day of April, 1884.

On the 25th day of April, 1884, the grand jury of El Paso county presented separate indictments against Burt and Horn, charging them with the murder of the deceased Thomas Mode. On April 14, 1885, the trial of this cause commenced in Presidio county. At that time Burt and Horn had not been arrested on the indictments preferred against them, and no effort had been made on the part of the State to effect their arrest. On the trial appellant offered to read in evidence the depositions of Burt and Horn. The depositions were objected to by the district attorney upon the ground that said witnesses had been indicted for the same murder, and in support of this objection certified copies of the indictments were exhibited to the court. The court sustained the objection and rejected the depositions. Appellant excepted, and in a bill of exceptions presents the facts we have recited, and also the depositions in full of the said witnesses *Burt and Horn*. Appellant was convicted of murder in the second degree, and his punishment was assessed at five years' confinement in the penitentiary.

We are not aware that the precise question presented by the bill of exceptions has ever been adjudicated. We are very sure that it has never been passed upon by the courts of this State. We have diligently searched the authorities accessible to us, and have been unable to find a single case in point. It may be said, therefore, to be a question of "first impression," and we must determine it more by reason and analogy than by precedent. This we will do in accord-

ance with our best judgment as to what the rule should be in such a case.

Our statute provides that " Persons charged as principals, accomplices, or accessories, whether in the same indictment or different indictments, cannot be introduced as witnesses for one another, but they may claim a severance; and if any one or more be acquitted, or the prosecution against them be dismissed, they may testify in behalf of the others." (Code Crim. Proc., art. 731.) This provision has been often construed by the courts of this State, but has never been considered with reference to a case similar to the one now before us.

In the case before us, at the time the depositions were taken, the witnesses were competent; they were not then charged as principals, accomplices or accessories, and were not included within the terms or intent of this law. They had not then been indicted, but on the contrary they had been legally discharged upon a hearing on *habeas corpus* before the district judge, wherein they were accused of the murder of the deceased Mode. These facts were known to the prosecution. The contents of their depositions were also known to the prosecution. With a full knowledge of these facts the district attorney, the representative of the State, agreed in writing that the depositions might be read in evidence on the trial. Three days after this agreement was made and filed in the cause, the State, by another representative, the grand jury, presented the indictments against these witnesses, and insists that said indictments render their depositions incompetent evidence. Now the question is, the witnesses being competent when they testified by deposition, can their testimony be rendered incompetent by the subsequent act of the State, without the consent or fault of the defendant?

Principals, accomplices and accessories in crime are incompetent witnesses for each other, upon the ground that they are directly interested in the result of the prosecution. This being the sole ground of their exclusion, we can derive aid in the solution of the question before us by having recourse to the rules of the law governing the subject in civil matters in other cases of witnesses disqualified, or claimed to be disqualified, by reason of interest.

In chancery proceedings the rule is well established that in cases of disqualifying interest, where the witness previously to becoming disqualified has given a deposition in the cause, the deposition may be read, as if he were since deceased, or insane, or otherwise incapacitated. (Gresley on Ev., 366, 367.) And Mr. Greenleaf lays it down that such deposition may also be read in a trial at law of

an issue out of chancery; and he further says: "In other trials at law, no express authority has been found for reading the deposition, and it has been said that the course of practice is otherwise; but no reason is given, and the analogies of the law are altogether in favor of admitting the evidence." (1 Greenl. Ev., § 168.) Again this author says: "It has been laid down in general terms that where one person becomes entitled to the testimony of another, the latter shall not be rendered incompetent to testify by reason of any *interest subsequently acquired* in the event of the suit. But, though the doctrine is not now universally admitted to that extent, yet it is well settled and agreed that in all cases where the interest has been subsequently created by the fraudulent act of the adverse party, for the purpose of taking off his testimony, or by any act of mere wantonness, and aside from the ordinary course of business on the part of the witness, he is not thereby rendered incompetent." (§ 418. See, also, 1 Stark. Ev. (9th ed.), p. 22, and note 1.)

In our own State some of the decisions seem to lay down the rule that if the witness is competent at the time his deposition is taken, such deposition may be read in evidence on the trial of the cause, though the witness be incompetent to testify at the time of the trial. (*Lobdell* v. *Fowler*, 33 Texas, 346; *Burleson* v. *Burleson*, 28 Texas, 383; *Ables* v. *Miller*, 12 Texas, 109.) In *Webster* v. *Mann*, 56 Texas, 118, however, it is said that "the facts and law existing at the time of the trial, and not at the time of taking a deposition, must be looked to ordinarily to determine its competency," citing Week's Law of Depositions, 515; and in that case the deposition of a witness taken after he was indicted, but before he was convicted of the crime of forgery, was excluded, the court remarking,— "The judgment of conviction is but the evidence of the moral depravity which creates the disqualification, and the reason for the exclusion of the testimony of a party while under indictment upon which a conviction is subsequently had is just as strong as though his testimony is given after conviction." It must be noted that in that case the disqualification of the witness arose from *infamy* and not *interest*, and the infamy existed as well at the time his depositions were taken as at the time of the trial. In the case we are considering the disqualification did not exist at the time the depositions were taken, but arose subsequently. The cases are, therefore, essentially dissimilar. The case we are considering is not an ordinary one, but is *sui generis*, and does not come within the general rule stated above, that the facts and law existing at the time of the trial must control the admissibility of the deposition.

Our judgment and our sense of right, fairness and justice force us to the conclusion that the depositions of Burt and Horn are admissible. 1. Because they were taken at a time when the witnesses were competent to testify. 2. Because the disqualification now urged against their admissibility is by reason of the act of the prosecution. 3. Because the circumstances of the case show, *prima facie,* we think, that Burt and Horn were not indicted in good faith, but were indicted solely for the purpose of depriving the defendant of their testimony. There is not, in the record before us, a particle of evidence which in the slightest degree connects these witnesses with the homicide. They were discharged upon an examination had immediately after the homicide. They were not indicted by the grand jury until nearly one year after the homicide, nor until after appellant had obtained their depositions, and had obtained a change of venue; and after they were indicted no effort whatever on the part of the State was made to obtain their arrest, and yet the prosecution must have known where they resided, because their depositions on file in the cause showed where they resided. 4. Because, before the witnesses were indicted, the State by her representative agreed in writing that these depositions might be read on the trial; thereby conceding the competency of the witnesses at that time.

We think it would be bad faith on the part of the State, and a fraud upon appellant's rights, to deprive him of the depositions of these witnesses under the peculiar circumstances of this case. Their testimony is most material and vital to his defense, and it should not rest within the power, or within the desire of the prosecution to take it away from him, under the circumstances and in the manner here attempted. We can never give our sanction to such a procedure. These witnesses, if disqualified, are disqualified by the act and procurement of the plaintiff in the cause, the State of Texas, and we must say that the record before us irresistibly forces upon us the conclusion that this disqualification is attempted for the sole purpose of depriving the appellant of this testimony. In the language of Mr. Greenleaf, it appears to us that the disqualification of these witnesses " has been subsequently created by the fraudulent act of the adverse party, for the purpose of taking off their testimony." (1 Greenl. Ev., § 418.) In such case the disqualification does not exclude the evidence. (*Burgess* v. *Lane*, 3 Greenleaf, 165; *Manchester Iron Co.* v. *Sweeting*, 10 Wendell, 162.) We hold that the court erred in rejecting the depositions of the witnesses Horn and Burt.

It is unnecessary, we think, that we should discuss other ques-

tions presented by counsel for appellant.   Under repeated decisions of this court, the exceptions to the indictment were properly overruled.   Upon another trial of the cause, with the testimony of Burt and Horn before the court, the learned judge will no doubt give a charge applicable to the facts of the case.   In our opinion, the testimony of these witnesses would make it incumbent upon the court to instruct the jury upon the law of manslaughter and self-defense, as well as murder in the second degree.

Because the court erred in rejecting the depositions of Horn and Burt, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered May 9, 1885.]